**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Henry Clarence Epp IV,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>Prisma Health,<br><br>　　　　　　Defendant. | **COMPLAINT**<br>**(Jury Trial Demanded)**<br><br>C/A 3:22-00694-MGL-PJG |

Plaintiff, complaining of the Defendants, respectfully shows to the Court:

## PARTIES AND JURISDICTION

1.　　　Plaintiff, Henry Clarence Epp IV is citizen and resident of Cleveland, Ohio. Plaintiff was previously employed with Defendant in Richland County, South Carolina.

2.　　　The Defendant, Prisma Health is a network of hospital and healthcare facilities operating throughout South Carolina including a facility in Richland County, South Carolina.

3.　　　This action arises under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1965, and the common law of South Carolina.

4.　　　Jurisdiction and venue are proper, because the parties have sufficient connections to this circuit, and the events giving rise to this action occurred in Richland County, South Carolina.

## FACTUAL ALLEGATIONS

5.　　　Plaintiff married his partner of nearly eight years, Amy Naughton on February 29, 2020.

6.　　　Defendant hired Naughton as Certified Registered Nurse Anesthetist (CRNA). She began her employment on July 9, 2018.

1

7.       Defendant hired Plaintiff as a CRNA on March 23, 2020

8.       Throughout his employment with Defendant, Plaintiff performed his job duties in a competent if not more than competent manner. Plaintiff has no workplace history of poor performance or discipline.

9.       On October 18, 2020, Naughton and Plaintiff separated from one another, with Naughton leaving the marital home permanently.

10.      From the time Naughton left on October 18, 2020, until the morning of October 21, 2020, Plaintiff had no contact with Naughton outside of several text messages requesting separate telephone service accounts.

11.      Plaintiff now knows that Naughton left the marriage as a result of an adulterous relationship with Samantha Bido, a female CRNA with Prisma Health in Columbia, SC.

12.      Plaintiff now knows that Naughton has partaken with Bido in at least a portion these activities.

13.      On October 21, 2020, Naughton and Plaintiff met at Prisma Health at approximately 6:30AM near the beginning of their shifts.  In a private area, Plaintiff asked Naughton what was going on.  Naughton stated that she was seeking a divorce.  This conversation lasted only a few minutes, with no patients nearby.  At no point did Plaintiff raise his voice, become angry, make any threats, or act in any way hostile.

14.      On October 21, 2020 at approximately 6:50 AM Plaintiff texted Rob Britt, Assistant Chief CRNA at Prisma Health.  Plaintiff informed Britt of what occurred with Naughton earlier in the morning, Britt offered to cover Plaintiff's remaining shift for the day.

15.      Britt did cover Plaintiff's shift for the remainder of the day.  Plaintiff stated at approximately 10AM that he would return to work the next day.

2

16.     On October 22, 2020 Plaintiff worked a full regular shift at Prisma Health without incident.

17.     During Plaintiff's shift, Britt and Plaintiff's supervisor, Beth Selbee, Chief CRNA, had a brief conversation regarding the events of October 21, 2020.  Selbee and Britt asked if Plaintiff was ok, and Plaintiff responded that he was.

18.     Britt and Selbee did not have any similar conversation with Naughton or Bido.

19.     On October 23, 2020 Plaintiff worked a full regular shift at Prisma Health without incident.

20.     On October 24, 2020 Plaintiff sent an email to Britt and Selbee, requesting a brief medical leave of absence to refocus given the stressful marriage-ending events of the prior week.

21.     On October 26, 2020 Plaintiff was notified by Prisma Health that his request for a brief period of non-FMLA medical leave was approved.

22.     On October 29, 2020 Plaintiff requested via text message to Britt information detailing the process required to return to work.

23.     On October 30, 2020 Plaintiff received an email from Selbee instructing him to deal with Selbee alone throughout the return to work process.

24.     Selbee stated that the following things needed to be occur or be provided in order to return: A) a note from Plaintiff's doctor with clearance to return to work; B) clearance from the Employee Health Department; C) clearance from the Medical Staff Affairs Department; D) updated short term disability and leave of absence applications.

25.     Later on October 30, 2020, the Medical Staff Affairs changed Plaintiff's credentials status to "Leave of Absence."  Upon information or belief this was at the direction of Selbee and the Prisma Health Chief of Staff did not issue approval for such change.

26.    On November 2, 2020 Plaintiff began receiving short term disability for his leave of absence.

27.    On November 3, 2020 Plaintiff attended a self-scheduled counseling session with Rodney Williams, a Prisma Health employee working within the Employee Assistance Program.

28.    On November 4, 2020 Plaintiff's Prisma Health network access was revoked by Prisma Health employee Teddius Williams, Provider Integration Manager.

29.    Without Prisma Health network access, Plaintiff could not interact with HR, update his credentials, receive emails from the hospital, manage his attendance and time off requests, and obtain other information such as benefits and payroll.

30.    The lack of access to this network imposed increased difficulties to completing the return to work conditions imposed by Selbee.

31.    On November 5, 2020 Plaintiff attended a second self-scheduled counseling session with Rodney Williams.

32.    On November 6, 2020 Plaintiff was evaluated by Prisma Health Physician Dr. Hailley Story.  Dr. Story provided Plaintiff with written documentation stating that he was fit to return to work with zero restrictions.

33.    On November 6, 2020 Plaintiff presented the documentation from Dr. Story to Prisma Health's Employee Health office, showing that he had completed all requirements stipulated by HR Policy 1.12.

34.    On November 6, 2020, Employee Health approved Plaintiff to return to work, immediately, full time.

35.    Later on November 6, 2020, Plaintiff informed Selbee by text that he was cleared to work.

36.    Selbee then contacted Plaintiff by telephone and text message and alleged that he would not be permitted to return to work without documentation from Medical Staff Affairs.

37.    Selbee further stated that Plaintiff needed to be evaluated and cleared by an Employee Health Physician at Richland Hospital.

38.    Plaintiff informed Selbee that he had already spoken to Medical Staff Affairs, who stated that their office did not clear employees to work.  Plaintiff explained that Medical Staff Affairs stated that Employee Health, who had already approved Plaintiff to return to work, was the appropriate office to clear his return to work.

39.    Plaintiff further questioned Selbee as to whether he would be able to schedule an appointment with the appropriate Employee Health Physician at Richland Hospital given that his network access was revoked.

40.    Selbee stated that Plaintiff was not permitted to schedule an appointment with an Employee Health Physician at Richland Hospital and that she could offer Plaintiff no further guidance.

41.    Several minutes after ending the call with Selbee, Plaintiff received a phone call from the Employee Health office.  Employee Health stated that they realized they "spoke too soon" and that Plaintiff was no longer cleared to return to work.

42.    Plaintiff immediately returned to the Employee Health office to obtain additional information as to the sudden reversal in his clearance to return to work.

43.    Plaintiff spoke with the Director of Employee Health.  She was uncooperative and would not answer any questions as to why Plaintiff was no longer cleared to return to work despite meeting all the requirements prescribed by Prisma Health HR Policy.

44.     The Director of Employee Health eventually stated that she would provide to Plaintiff the phone number of an employee who was involved in the decision.

45.     Plaintiff discovered, the number provided by the Director of Employee Health was simply the general contact number for the Prisma Health Human Resources office.

46.     On November 9, 2020 Plaintiff attended a third self-scheduled counseling session with Rodney Williams.

47.     Later on November 9, 2020 Plaintiff attempted to contact Selbee regarding his lack of clearance to return to work despite meeting all requirements to work.  Selbee refused to speak with Plaintiff at this time.

48.     After attempting to contact Selbee on November 9, 2020, Plaintiff visited the Prisma Health Employee Health office.

49.     Plaintiff was once again informed by Employee Health that there were no barriers to his return to work and that he was fully cleared to resume working immediately.

50.     Plaintiff then called the Prisma Health Human Resources office.

51.     A representative of Prisma Health Human Resources stated that there were no barriers preventing Plaintiff from returning to work, and that based on his file he was clear to return.

52.     Plaintiff again contacted Selbee to inform her that both Employee Health and Prisma Human Resources stated that he was completely cleared to return to work, immediately.

53.     Late in the afternoon on November 9, 2020 Plaintiff received a call from Selbee, Britt, and Elizabeth Marks, VP of Prisma Health Human Resources.

54.     Selbee, Britt, and Marks stated that Plaintiff would need to be cleared by the Employee Assistance Program before returning to work.

55.     Plaintiff informed them that he was already utilizing the Employee Assistance program and had a pending appointment with a psychiatrist for the following week.

56.     Plaintiff was told that he would need to meet with Stephanie John of the Employee Assistance Program at 9:00AM on November 12, 2020.

57.     On November 12, 2020 Plaintiff met with Employee Assistance Program manager Stephanie John at Prisma Health Baptist.

58.     Plaintiff underwent a several hour examination with John.

59.     During this examination Plaintiff agreed to disclose his medical records from other mental health professionals regarding the circumstances of his leave of absence.

60.     John informed Plaintiff that she would not accept the recommendation of Dr. Story that Plaintiff was cleared to return to work, despite the fact that Dr. Story is a Prisma Health physician.

61.     John is a Licensed Marriage and Family Therapist.  John is not a medical doctor or psychiatrist.

62.     On November 13, 2020 Plaintiff was informed that the Employee Assistance Program was referring him to Lake Psychological Services for further management.

63.     On November 17, 2020 Plaintiff received a telephone call from Stephanie John. John informed Plaintiff that in order to return to work, Prisma Health Human Resources department required a statement of clearance from his psychiatrist, because Plaintiff had an established relationship with him as a provider.

64.     Later on November 17, 2020 Plaintiff met with his psychiatrist, Dr. Brandon Kilgore, a Prisma Health employee.

7

65.     Dr. Kilgore agreed to prepare written documentation stating that Plaintiff was fit to return to work with zero restrictions.

66.     On November 19, 2020 Plaintiff spoke with officials from the Prisma Health Human Resources department.

67.     Once again, Plaintiff was informed by Human Resources that his employee file contained absolutely no restrictions or missing documentation which would prevent him from fully and immediately returning to work.  Plaintiff again notified Selbee of the same.

68.     Also, on November 19, 2020, Plaintiff attended a fourth self-scheduled counseling session with Rodney Williams.

69.     On November 20, 2020, Plaintiff returned Dr. Kilgore's office to obtain the written documentation providing that Plaintiff was fully cleared to immediately return to work without restrictions.

70.     While at Dr. Kilgore's office, Dr. Kilgore informed Plaintiff that he received a call from Stephanie John.

71.     Dr. Kilgore informed Plaintiff that John stated "[Dr. Kilgore] had not understood the situation" regarding Plaintiff's return to work status.

72.     On November 20, 2020 the Open Enrollment Period for Prisma Health Employee benefits ended.

73.     Plaintiff was not permitted to register for employee benefits.

74.     On November 23, 2020 Plaintiff contacted *The Standard*, Prisma Health's 3rd party benefits provider, and ended his short-term disability coverage.

8

75.     Plaintiff ended his short-term disability coverage based on the documentation he previously submitted which should have permitted him to return to work immediately without restriction.

76.     On November 23, 2020 Plaintiff also contacted Stephanie John to inform her that he ended his short-term disability coverage.

77.     Plaintiff informed John that he fulfilled the necessary requirements to return to work immediately with no restrictions.

78.     John stated that Human Resources would not review his attempt to return to work without receiving the letter from Dr. Kilgore.

79.     On November 27, 2020 Plaintiff provided to John a memo composed by Dr. Kilgore which stated that Plaintiff was able to return to work immediately with no restriction.

80.     On December 1, 2020 Plaintiff was contacted by an individual from the Advanced Practice Providers Credentialing Subcommittee ("APP") which is a subcommittee of the Medical Executive Committee at Prisma Health.

81.     Plaintiff was told that there was an APP meeting scheduled for December 4.

82.     Plaintiff was not allowed any details as to what this APP meeting was in regard to.

83.     On December 4, Plaintiff attended a meeting of the Advanced Practice Providers Credentialing Subcommittee.  Present were Reid Pribble, Chief of Staff for Prisma Health Hospital, Teddius Williams, Provider Integration Manager, and Alejandro Louis, Trauma Medical Director.

84.     The meeting lasted less than five minutes.

85.    The meeting was a casual conversation regarding the October 21, 2020 conversation with Naughton at Prisma Health in which Naughton stated to Plaintiff that she wanted a divorce.

86.    Plaintiff informed the APP that he had gone through every process required in order to return to work immediately.

87.    Plaintiff was told that he would be given additional information from the subcommittee no later than December 9, 2020.

88.    On December 7, 2020 Plaintiff was contacted by a Prisma Health employee stating that he was required to meet with Dr. Kopera, Medical Director of Employee Health for Prisma Health.

89.    Dr. Kopera is a physiatrist; not a psychiatrist, psychologist, or mental health professional.

90.    Dr. Kopera's practice focuses on physical rehabilitation from physical injuries.

91.    On December 10, 2020 Plaintiff met with Dr. Kopera. Dr. Kopera spoke with Plaintiff about the ongoing issues regarding his return to work.

92.    Dr. Kopera spoke with Plaintiff for less than ten minutes.

93.    Plaintiff requested that Dr. Kopera clear Plaintiff to return to work consistent with the determination of many other doctors and mental health professionals.

94.    Dr. Kopera refused to make a determination on Plaintiff's fitness to return to work.

95.    At the end of the meeting, Dr. Kopera informed Plaintiff that he was to speak with Elizabeth Marks later in the day regarding his ongoing return to work issue.

96.    Over the next several days Plaintiff attempted to contact both Selbee and Prisma Human Resources.

97.     Plaintiff was unable to reach Selbee.

98.     Any attempt to contact Human Resources led to individuals stating that they could not give Plaintiff any information regarding his return to work status.

99.     On December 15, 2020 Plaintiff was able to speak to Selbee.  Selbee alleged that she did not know what was going on with Plaintiff's return to work status.

100.    Plaintiff requested that Selbee seek information from Elizabeth Marks, to which Selbee agreed.

101.    On December 16, 2020 at 3PM Plaintiff spoke to Selbee.  Once again Selbee stated that she did not know what was going on with Plaintiff's return to work status.

102.    At 3:30PM the same day, Selbee, Elizabeth Marks, and Tedius Williams called to inform Plaintiff of a decision rendered by the Advanced Practice Providers Credentialing Subcommittee.

103.    Plaintiff was told that he would be required to enroll in and complete distressed provider program at his own expense in order to return to work.

104.    Marks, Selbee, and Williams refused to answer even a single question regarding this distressed provider course.

105.    The call lasted less than fifteen minutes.

106.    Marks, Selbee, and Williams refused to inform Plaintiff as to where such a course could be found, what accreditation was needed for such a course, the timeline for completing such a course, or any other basic information needed to comply with the decision.

107.    Plaintiff was provided no paperwork or documentation regarding the contents of the discussion.

108.    Selbee, Marks, and Williams further required Plaintiff to provide a full release authorization information from the distressed provider program to be provided to Prisma Health.

109.    Selbee, Marks, and Williams instructed Plaintiff to speak with Stephanie John on the following day, December 17, 2020 for more information.

110.    On December 17, 2020 Plaintiff spoke with John regarding the distressed provider program requirement.  John provided Plaintiff with two programs of which Prisma Health would approve of.

111.    John stated that if Plaintiff found other potential distressed provider programs, Plaintiff could propose such courses to her for approval.

112.    John could not provide Plaintiff with any credentialing agency for such a program.

113.    One of the two programs identified by John cost several thousand dollars, could not be completed or even begun for several months after December 2020, and required significant travel.

114.    The other alleged program identified by John involved a family of four whose primary business appeared to be motivational speaking engagements.

115.    The website for such alleged program offered no specifics as to price, time, or even the existence of a distressed provider program.

116.    Later on December 17, 2020 Plaintiff spoke with Elizabeth Marks.

117.    Plaintiff informed Marks that based on Prisma Health policy he should have been able to return to work as of November 6, 2020.

118.    Plaintiff requested that Marks show him which Prisma Health policy dictated or allowed for the extra barriers to return to work to be imposed upon him.  Marks was unable to articulate any such policy.

12

119.    Plaintiff then asked Marks what would happen to him if he was unable or unwilling to complete distressed provider course.  Marks again was unable to articulate any answer.

120.    Plaintiff questioned Marks as to why Prisma Health would not pay for a course that they required him to undergo.  Marks could not articulate an answer, but simply stated that Plaintiff was to pay for such a course.

121.    Marks further stated to Plaintiff that even if he completed the distressed provider course, he may not be allowed to return to work.

122.    Marks stated that Prisma Health may still impose even more restrictions or requirements upon Plaintiff's possible return to work.

123.    Plaintiff stated to Marks that Prisma Health's behavior in continuing to impose additional and unnecessary restrictions on his ability to return to work, outside of what is permitted by Prisma Health's written policy, was discriminatory and retaliatory based upon the perception that Plaintiff had a mental disability and based upon the fact that Plaintiff took a brief period of non-FMLA medical leave and short-term disability coverage.

124.    On December 21, 2020 Plaintiff received an official letter from Teddius Williams relaying the decision of the Advanced Practice Providers Credentialing Subcommittee requiring that Plaintiff complete a distressed provider course.

125.    The Advanced Practice Providers Credentialing Subcommittee alleged that Plaintiff violated a Prisma Health Policy by engaging in a behavior during Plaintiff's October 21, 2020 conversation with Naughton defined as "Behavior that Undermine a Culture of Safety."

126.    This allegation was false.

127.    Plaintiff has observed many other employees, female, those not perceived to be disabled, those who have not sought medical leave, and/or those who have not complained of

13

discriminatory or retaliatory actions, engage in similar or more egregious behavior than Plaintiff's and receive no negative consequences whatsoever.

128.    The Advanced Practice Providers Credentialing Subcommittee further placed Plaintiff onto a six month Focused Professional Practice Evaluation in which the subcommittee would monitor him.

129.    The Advanced Practice Providers Credentialing Subcommittee further required Plaintiff to enroll and complete in the distressed provider program, as well as sign a release and authorization to allow Prisma Health access to information related to such program.

130.    The Advanced Practice Providers Credentialing Subcommittee further stated that the actions taken by the Subcommittee were not adverse or disciplinary actions.

131.    Prisma's Medical Staff Bylaws specifically define the actions taken against Plaintiff as adverse employment actions.

132.    On the morning of December 23, 2020, Plaintiff spoke with Stephanie John over the phone.  Plaintiff provided John with a potential distressed provider program for her to approve. John refused to approve the program that Plaintiff identified.

133.    On the afternoon of December 23, 2020, Plaintiff provided John with two additional programs for her approval.

134.    John stated to Plaintiff that she refused to evaluate the two additional courses as she had set a noon deadline for the submission of any courses for approval.

135.    No such noon deadline was ever communicated to Plaintiff.

136.    On December 28, 2020 Plaintiff received a letter from Prisma Health terminating his employment.

14

137.    This letter alleged that Plaintiff failed to complete a requirement imposed by the Advanced Practice Providers Credentialing Subcommittee to enroll in a distressed provider program by December 23, 2020.

138.    No such December 23, 2020 enrollment deadline was ever imposed upon Plaintiff.

139.    This letter contains further false or misleading allegations against Plaintiff.'

140.    Many of the actions taken by Defendant employees, including but not limited to Selbee, Marks, and the APP are in direct violation of Defendant's Medical Staff Bylaws and HR Policies.

141.    In March of 2021 Naughton was granted five full weeks of medical leave and short-term disability coverage to undergo mental health counseling as a result of the end her marriage with Plaintiff.

142.    Naughton's reason for taking medical leave was the same as Plaintiff's original usage of medical leave: stress related to the end of their shared marriage.

143.    Selbee, Plaintiff's supervisor, is aware of a number of incidents in which Naughton has demonstrated actual and concerning mental instability.  Selbee was aware of Naughton sending harassing, abusive, and threatening messages to Plaintiff; of Naughton trespassing onto Plaintiff's property; of Naughton's attempt to break into Plaintiff's home by using physical force against Plaintiff; of Naughton's regular abuse of drugs and alcohol; and of Naughton's regular erratic and illogical behavior.

144.    Nevertheless, upon information and belief, Naughton was not required to complete many, if not all, of the substantial barriers to return to work that Prisma Health imposed upon Plaintiff when she returned from her five weeks of medical leave.

145.    Specifically, Naughton was not required to complete a distressed provider course and her credentials as a CRNA were not placed under leave of absence status.

146.    Selbee was also aware of the regular drug and alcohol usage of Bido, including the usage of drugs while working, and the use of drugs intended for use by patients.

147.    Nevertheless, upon information and belief, Bido was never made to undergo any of the extensive mental health examination and treatment that Prisma mandated of Plaintiff.

148.    Plaintiff is aware of numerous statements by Selbee, his supervisor, including but not limited to the allegation that Plaintiff is crazy, mentally unstable, potentially violent, a drug or alcohol abuser, or that she otherwise perceives Plaintiff as mentally disabled.

149.    These statements and allegations by Selbee are false.

150.    Plaintiff does not have any mental condition which would impair his ability to fully and successfully complete the duties of his position.

151.    Upon information and belief, Prisma never intended for Plaintiff to be able to return to work, regardless of how many different return to work conditions were imposed upon and completed by Plaintiff.

## FOR A FIRST CAUSE OF ACTION
### (Title VII Sex Discrimination)

152.    Plaintiff realleges the foregoing where consistent.

153.    Plaintiff, a male, is a member of a sex-based protected class.

154.    Plaintiff was subjected to disparate treatment based on his sex from Defendant's employees during his return to work process.

155.    Defendant treated Plaintiff disparately with respect to the terms and conditions of her employment in comparison to similarly situated female employees.

156.    Specifically, Plaintiff was required to undergo a battery of requirements and

157. The sexual harassment, sexually hostile work environment, and disparate treatment described above amounts to unlawful gender discrimination prohibited by Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, and amendments thereto, and is the proximate cause of the Plaintiff's loss of earnings, loss of prospective earnings and benefits, embarrassment, humiliation, mental anguish, and mental suffering, for which the Plaintiff is entitled to an award of actual damages, as well as punitive damages for the willful intentional acts of the Defendant through its agents and employees, as determined by a jury, and for reasonable attorney's fees and costs of this action.

**FOR A SECOND CAUSE OF ACTION**
**(Title VII Retaliation)**

158. Plaintiff realleges the foregoing where consistent.

159. Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [he] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a).

160. Plaintiff engaged in a protected activity by making numerous complaints to Defendant that he was being subjected to disparate treatment in his return to work process on account of his male status.

161. As a result of Plaintiff's complaints, Defendant's agents/employees refused to investigate or take action regarding Plaintiff's complaints, continued and worsened the disparate treatment Plaintiff faced, imposed additional and excessive conditions upon his return to work process, and ultimately terminated Plaintiff for pretextual reasons.

162. Defendant is liable to Plaintiff for its willful and wrongful retaliation against Plaintiff for the protected actions he took against unfair, egregious, and justifiably perceived sex based discrimination.

163.    As a direct and proximate result of the Defendant actions, Plaintiff has suffered, and Defendant is liable to Plaintiff for back pay, front pay, loss of benefits, prospective benefits, pain and suffering, emotional distress, and reputational harm; as well as the reasonable attorney's fees and costs associated with this action. Plaintiff also seeks pre-judgment interest on all damages sought.

**FOR A THIRD CAUSE OF ACTION**
**(ADAAA Disability Discrimination)**

164.    Plaintiff realleges the foregoing where consistent.

165.    Defendant by and through its employees perceived Plaintiff to have a mental disability.

166.    Plaintiff does not, and at all times relevant hereto, has not, actually suffered from any form of disability.

167.    Plaintiff is, and at all times relevant hereto, was qualified and able to do his job without accommodations.

168.    Plaintiff was treated in a worse manner than comparable employees who were not perceived as disabled.

169.    Defendant ultimately imposed excessive and disparate terms for clearance for return to work after Plaintiff took leave, in an attempt to bar Plaintiff any legitimate opportunity to return to work, and ultimately terminated Plaintiff's employment on the basis of Defendant's perception of Plaintiff as disabled.

170.    There is no legitimate reason for the negative treatment, excessive return to work clearance requirements, or termination for which Plaintiff suffered.

171.    The factual allegations above demonstrate that Defendant's excuses for its behavior are pretext for conduct which constitutes disability discrimination in violation of the ADAAA.

18

172. As a result of Defendant's conduct, Defendant has directly and proximately caused and is liable for all damages, including reinstatement or front pay, and actual damages to include back pay, back benefits, interest on back pay and benefits, damages for pain, suffering, emotional stress, and anxiety, damages for reputational losses and loss of good will, and pre-judgment interest on all damages from Defendant. Plaintiff further seeks and is entitled to recover the reasonable attorney fees and costs of this action.

173. Defendant's actions as set forth above were undertaken willfully, wantonly, knowingly, intentionally and recklessly and with utter disregard for the federally protected rights of the plaintiff, and therefore Plaintiff is entitled to recover punitive damages from Defendant.

**FOR A FOURTH CAUSE OF ACTION**
**(ADAAA Retaliation)**

174. Plaintiff realleges the foregoing where consistent.

175. The above incorporated factual allegations amount to retaliation in violation of the ADAAA.

176. Specifically, Plaintiff alleges that he was subjected to disparate treatment and suffered an additional adverse employment action (her termination) because of her complaints about perceived-disability discrimination, and use of medical leave.

177. Causation for retaliation in this case, in addition to the above, is further indicated by Plaintiff's prior positive work performance, pretext, and temporal proximity.

178. Plaintiff therefore seeks, and is entitled to recover, all damages available to him under the ADAAA including consequential and compensatory damages, and equitable relief including back pay, interest on back pay, and lost benefits, reinstatement or front pay, mandatory corrective action to prevent this sort of behavior from reoccurring, and corrections to Plaintiff's

19

personnel records to remove the unfair and discriminatory treatment that he received, including but not limited to, termination and suspension of his medical clearance.

179.    Plaintiff also seeks, and is legally entitled to, attorney fees and costs.

180.    Plaintiff also seeks, and is entitled to, based on the egregious intentional conduct alleged, punitive and exemplary damages to the extent those damages can be recovered at law against the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for damages awarded to him in an amount to be determined reasonable by a jury against the Defendant, where sought, for all damages directly and proximately resulting from the claims alleged above. Plaintiff further requests and is entitled to the reasonable attorney fees and costs of this action, liquidated damages and any equitable relief the Court should deem just and proper. Plaintiff also requests pre-judgment interest, as legally available.

**CROMER BABB PORTER & HICKS, LLC**

BY:     _s/ Samantha E. Albrecht_                  .
         Samantha E. Albrecht (#12546)
         1418 Laurel Street, Suite A (29201)
         Post Office Box 11675
         Columbia, South Carolina 29211
         Phone: 803-799-9530
         Fax:    803-799-9533
         samantha@cbphlaw.com

***Attorneys for Plaintiff***

March 4, 2022
Columbia, South Carolina

20